1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

10

RICKY D. GORDON,

11

Plaintiff,

12

v.

13

JAY INSLEE, et al.,

14

Defendant.

CASE NO. 3:21-CV-5802-BJR-DWC

REPORT AND RECOMMENDATION

Noting Date: February 24, 2023

15

16     The District Court referred this action to United States Magistrate Judge David W.

17  Christel. Plaintiff Ricky D. Gordon, aka Deanna Lynn Gordon[1], proceeding *pro se* and *in forma*

18  *pauperis*, brings claims under 42 U.S.C. § 1983 alleging Eighth and  Fourteenth Amendment

19  claims arising out of her[2] treatment as a transgender prisoner. Currently before the Court is

20

21

22

23

24

---

[1] Plaintiff's legal name is Deanna Lynn Gordon (Dkt. 5 at 1, 5), but all correspondence must be directed to plaintiff's "commitment name," Ricky D. Gordon, which is reflected in the caption.
[2] Plaintiff utilizes female pronouns. *See, e.g.,* Dkt. 5 (using female pronouns throughout). The Court adopts plaintiff's preferred usage.

defendants' motion for summary judgment (Dkt. 33). For the reasons discussed below, the Court recommends defendants' motion be GRANTED.

## I. BACKGROUND

**A.    Procedural History**

Plaintiff is a transgender prisoner currently confined at Monroe Corrections Center Twin Rivers Unit ("MCC-TRU"); plaintiff has previously been confined at other prisons in Washington State, including the Washington State Reformatory unit of MCC ("MCC-WSR"), Stafford Creek Corrections Center ("SCCC") and the Washington State Penitentiary ("WSP"). Plaintiff initiated this matter on October 28, 2021 ( Dkt. 1), alleging defendants violated her Eighth and Fourteenth Amendment rights by failing to house her in a women's facility and by delaying her gender confirmation surgery. Dkt. 5 at 2. Plaintiff names as defendants Washington Governor Jay Inslee, Department of Corrections ("DOC") Secretary Cheryl Strange, DOC Deputy Secretary Julie Martin, former DOC Deputy Assistant Secretary Ronald Haynes, MCC Superintendent Erik Jackson, former Washington Corrections Center for Women ("WCCW") Superintendent Jeneva Cotton, Dr. Bruce Gage, Dr. Karrie Rainer, Dr. Gabreielle Gaspar and Dr. Areig Awad. Plaintiff seeks damages and injunctive relief ordering compliance with the medical and mental health treatment plans approved by DOC's Gender Dysphoria Care Review Committee ("GD-CRC" or "Committee") in 2021, and requiring her transfer to a women's prison. Dkt. 5 at 15.

Defendants have filed a motion for summary judgment (Dkt. 33), together with a *Rand* notice and the declarations of Deborah Wofford, Charlotte Headley and Paul Clark (Dkts. 34, 35, 36, 37). Plaintiff filed a response (Dkt. 39), to which she has attached the declarations of Aaricka Aminah Assad, Scott Alan Freeburg, Calvin E. Jolicoeur and Aaron Thomas, and numerous

documentary exhibits (Dkt. 39-1). Defendants filed a reply (Dkt. 40) and the declaration of Karie Rainer, Ph.D. (Dkt. 41).

**B.   Facts**

Plaintiff is a male-to-female transgender prisoner who first entered DOC custody on December 29, 2015. Plaintiff is serving a sentence for one count of first degree rape of a child, first degree child molestation, and two counts of possession of depictions of a minor engaged in sexually explicit conduct. Dkt. 34 at ¶ 5; Dkt. 34-2. Plaintiff's current earned release date is March 23, 2039. Dkt. 34 at ¶ 5. The victim of plaintiff's crimes was the then-six-year-old daughter of plaintiff's ex-wife, Rose Gordon, who was plaintiff's co-defendant and is currently confined at the Washington Corrections Center for Women ("WCCW"). Dkt. 34-2 at 17; Dkt. 35 at ¶ 5. Rose Gordon is serving a sentence for rape of a child in the first degree and multiple additional related counts. Dkt. 35 at ¶ 5. Her current earned release date is September 12, 2038. *Id*.

1.   Plaintiff's Gender Dysphoria and Treatment

Plaintiff's earliest DOC mental health assessment in the record (dated February 16, 2016) reflects a "well-established" diagnosis of Gender Dysphoria, ("GD") and indicates plaintiff seeks a possible "restart" of hormones. Dkt. 36-3 at 302. Plaintiff was also diagnosed with depression and ADHD. *Id*. The assessment relates a history of feeling like a girl from an early age, cross-dressing extensively, and making a transition by taking hormones and undergoing surgery on her Adam's apple to appear more feminine. *Id*. at 301.

Under the Washington DOC Health Plan ("Health Plan"), a diagnosis of GD is considered Level 2, which allows for medically necessary care. Dkt. 36 at ¶ 4. DOC providers follow a published Gender Dysphoria Protocol ("Protocol"). *Id*; *see also* Dkt. 36-2. The Protocol provides for treatment of GD with hormones and allows for other treatment, including therapy

and Gender Confirmation Surgery ("GCS")[3]. Dkt. 36-2 at 3. Hormone and GCS treatment

require review and approval by the GD-CRC. Dkt. 36 at ¶ 4; Dkt. 36-2 at 2–3. At Committee

meetings, the presenting provider addresses the inmate's mental health history and diagnoses

(including gender identity), treatment expectations, current readiness and a medical evaluation.

Dkt. 36 at ¶ 4. The Committee also considers other health and treatment records and the findings

of outside consultants, if any. *Id*. For GCS requests, the Protocol requires patients to have at least

two years remaining on their sentence, to have been on clinician-ordered hormone therapy for at

least one year and, if the GD-CRC recommends consideration of GCS, a review by an outside

expert consultant. Dkt. 36-2 at 3. Once the consultation is complete, the GD-CRC will reconvene

to make a decision. *Id*.

Plaintiff made a request for hormone therapy in 2016, which—together with

psychotherapy—was approved by the GD-CRC on November 28, 2016. Dkt. 5 at 16–17. The

Committee's report states plaintiff lived as a woman for 22 years prior to her incarceration. *Id*.

She took hormones off and on, going off hormones when she could not afford them, and during

parts of her two different marriages. Plaintiff had a thyroid cartilage shaving procedure and, prior

to incarceration, was saving money for GCS. She had some breast enlargement as a result of her

previous hormone treatment. Plaintiff reported that estrogen both reduces her dysphoria and her

libido and sexual acting out behavior; however, the Committee did not identify any secondary

gain issues. Plaintiff came into prison possessing female underwear and has requested it while in

prison. The Committee noted plaintiff has "significant dysphoria related to not being able to be

fully herself," but also noted it is complicated by depression, which was "in fair control" with

---

[3] GCS is also known as Sex Reassignment Surgery ("SRS"). Plaintiff's medical records use both terms; for
consistency, the Court will use the term "GCS."

medication. Clinicians felt plaintiffs GD made further ability to control the depression difficult. The Committee noted plaintiff did not present a management problem, "but has become progressively more isolative and disinclined to be out among the prison population," and "is now almost completely withdrawn from previous active participation in groups." Plaintiff does not present as flamboyant and, "owing to unwanted attention" has adopted a less feminine appearance at times. Finally, the Committee noted plaintiff also has medical problems, including GERD, mixed hyperlipidemia, urge incontinence, and a history of syncope. The Committee supported the diagnosis of GD, authorized treatment and authorized hormone therapy if it was determined there are no physical complications.

After the approval but before hormone therapy was started, plaintiff was transferred from WSP to SCCC. Dkt. 41 at ¶ 4. The clinical team at SCCC questioned the basis for hormone therapy in light of plaintiff's history of sex crimes and raised a concern that plaintiff might be seeking it primarily to reduce libido. *Id.*

The GD-CRC performed a second review on May 23, 2017. Dkt. 36-4 at 152. The Committee noted plaintiff had continued on antidepressants since arriving at SCCC but had declined other mental health services, asserting there was "no point" because she believed "only hormone therapy will address depressive symptoms." *Id.* Committee members noted the possibility that some of plaintiff's dysphoria might come from being harassed by fellow inmates, and also suggested many of her depressive symptoms could be attributable to GD and disappointment at not yet being prescribed hormones. The Committee found no medical contraindications, but noted plaintiff had hyperlipidemia, hypertension, GERD and musculoskeletal pain. The Committee confirmed the GD diagnosis, found no evidence plaintiff was malingering GD in order to get estrogen, and authorized hormone therapy.

1    Plaintiff's medical records show she began hormone therapy on June 19, 2017. Dkt. 36-4

2  at 150. Plaintiff continued her hormone therapy while at SCCC but declined regular contact with

3  a mental health provider. Dkt. 41 at ¶ 4.

4    Plaintiff subsequently transferred to  MCC-WSR and submitted a request for GCS. *Id.*

5  Although her case was originally set for consideration by the GD-CRC on January 9, 2020, the

6  presentation was cancelled. Dkt. 36-3 at 37. In advance of the cancelled meeting plaintiff had

7  expressed concern that her request might be denied due to her medical conditions, which had

8  worsened as a result of her inactivity. *Id*. at 39.

9    Plaintiff's GCS request was considered, and denied, by the GD-CRC on March 12, 2020.

10  Dkt. 36-3 at 32. The Committee's report noted that in addition to GD, plaintiff has also been

11  diagnosed with Borderline Personality Disorder ("BPD") and Major Depressive Disorder with

12  anxious distress. Her presenter noted it was hard to discern whether depression and anxiety were

13  independent diagnoses or just symptoms of the GD and BPD, but some of the symptoms could

14  change with therapy. However, plaintiff refused to engage in either psychosocial or

15  pharmacologic treatment, "indicating that only hormone therapy and [GCS] will address her

16  mental health problems." The report also noted plaintiff's "prominent self-isolation in her cell,"

17  and a report of not wanting to interact with men. The consensus of the Committee and plaintiff's

18  treatment team was that plaintiff's lack of engagement in mental health treatment and health care

19  treatment for her medical issues (obesity, hypertension, hyperlipidemia, deconditioning due to

20  inactivity and bilateral venous insufficiency) placed her at high risk for complications from GCS.

21  The report also noted concern that plaintiff overvalued and had unrealistic expectations of the

22  impact of GCS. These issues, and plaintiff's lack of engagement in psychotherapy, called into

23  question whether plaintiff was able to provide adequate informed consent to the procedure. The

24

1    Committee concluded it was unable to support moving forward with GCS at that time, but

2    suggested plaintiff engage in psychotherapy and work to realistically examine the risks and

3    benefits of GCS. The committee expressed its openness to reconsidering GCS after plaintiff

4    made such efforts.

5    After the denial of her GCS request, plaintiff became more engaged in working with a

6    mental health provider. Dkt. 41 at ¶ 7. She was referred to outside psychologist Dr. Manthos, and

7    was evaluated for surgical readiness for GCS. *Id.*

8    Dr. Manthos issued her report on November 10, 2020. Dkt. 36-3 at 249. Dr. Manthos's

9    report indicates plaintiff rarely leaves her cell and feels unsafe in multi-user men's restrooms

10    where she will not have access to a single stall. Plaintiff reported chronic health issues she is

11    working on with her medical providers, motivated in part by a desire to be in good health for

12    GCS; plaintiff reported being more active in improving exercise and eating behaviors over the

13    past four months. After an extensive history, Dr. Manthos's report evaluates whether plaintiff

14    meets the criteria for GCS in the World Professional Association for Transgender Health

15    ("WPATH") Standards of Care, concluding each of the six criteria was met. *Id.* at 256–57.  Dr.

16    Manthos also found plaintiff met the additional DOC criteria for medical necessity. *Id.* at 257–

17    59. Dr. Manthos recommended plaintiff be referred for feminizing genital surgery and

18    feminizing chest reconstruction, that educational and informed consent processes be delivered in

19    a manner consistent with plaintiff's apparent learning disorder, that a treatment plan for mental

20    health be developed concurrently with the surgical plan, that plaintiff be considered for

21    placement in a women's facility, and that she be referred for consultation regarding facial hair

22    removal. *Id.* at 259–60.

23

24

1    Plaintiff's request for GCS was reconsidered by the GD-CRC on March 8, 2021. Dkt. 5 at

2   21. The Committee noted plaintiff was stable in her presentation as a transgender woman and

3   agreed she met the criteria for GD. The Committee's report notes plaintiff had knowledge of the

4   surgeries and their complications and had realistic expectations of the impact they would have.

5   The Committee also noted plaintiff had been evaluated by her primary care provider and cleared

6   by cardiology for potential health concerns. The Committee supported Dr. Manthos's

7   recommendations, except that it deferred to DOC Administration for decisions regarding

8   permanent facial hair removal and housing placement.

9    On June 15, 2021, Dr. Awad initiated a consultation request for the surgery. Dkt. 36-5 at

10   2. Plaintiff attended a surgical consultation with the outside provider, Stiller Aesthetics, on July

11   11, 2022. *Id*. at 12–17. Stiller Aesthetics requested additional mental health documentation on

12   July 22, 2022, which plaintiff's mental health provider, David Christensen, supplied on July 28,

13   2021. Dkt. 36-5 at 4, 9. Plaintiff is now scheduled for GCS in October 2023. Dkt. 36 at ¶9.

14    Access to outside surgical providers who offer GCS is very limited—and particularly for

15   providers willing to accept prisoner patients. Dkt. 36 at ¶ 6. This has resulted in long wait times

16   for initial appointments, and still longer wait times for scheduling surgery. *Id*. Scheduling

17   became even more difficult as a result of the COVID-19 pandemic, as these surgeries were

18   cancelled for an extended period. *Id*; Dkt. 41 at ¶ 7.

19   2.   Plaintiff's Housing

20    DOC's housing assessment and review requirements for transgender prisoners are

21   governed by Prison Rape Elimination Act (PREA) Prison and Jail Standards. Dkt. 34 at ¶ 3.

22   Inmates are assessed during an intake screening and upon transfer to another facility for their risk

23   of being sexually abused or abusive. *Id*. In addition, inmates' housing is reviewed every six

24   months. *Id*. Each facility has a multi-disciplinary team (MDT) that reviews inmate housing. *Id*.

1  Final decisions are made by a headquarters MDT for complex cases and cases where an inmate

2  requests a gender affirming facility. *Id*.

3    Plaintiff is currently housed at MCC-TRU, a men's prison; she was moved to MCC's

4  TRU unit from its WSR unit after her September 16, 2020 housing review. Dkt. 34-2 at 4.

5  Plaintiff is housed in a single cell and has been offered the option to shower separately from the

6  rest of her housing unit. Dkt. 34 at ¶8.

7    There are currently 31 transgender female prisoners at MCC-TRU, who defendants assert

8  are safely housed there. Dkt. 34 at ¶ 8. DOC currently has 183 inmates at its facilities who

9  identify as transgender. *Id*. at ¶ 4. Ten transgender women are currently housed at WCCW and

10  an additional 15 have requested to be transferred to WCCW from a male facility. *Id.*

11    Plaintiff has made multiple requests to be transferred to WCCW, which have been

12  reviewed by the MDT. Dkt. 34 at ¶ 6; Dkt. 34-3. Plaintiff's requests have been denied, due to

13  safety and security concerns raised by the current placement at that facility of plaintiff's ex-wife

14  and co-defendant, Rose Gordon. Dkt. 34 at ¶ 6; Dkt. 35 at ¶ 4.

15    Rose Gordon has reported safety concerns and requested a "keep separate" be issued to

16  prevent being housed with plaintiff. Dkt. 35 at ¶ 7; Dkt. 35-1.[4] Even before the "keep separate"

17  was issued, the MDC expressed concerns about housing both plaintiff and Rose Gordon in the

18  same facility in light of the dynamics of their relationship and the nature of the crimes they

19

20

21  _____

22    [4] Plaintiff disputes the statements attributed to Rose Gordon in the Declaration of Charlotte Headley (Dkt. 35 at ¶¶ 5–7) and in the narrative of Rose Gordon's interviews in the "keep separate" document (Dkt. 35-1 at 1).

23  Dkt. 39 at 5–7). Plaintiff seeks to strike the statements, and offers her own unsworn counter-statement. *Id*. The statements attributed to Rose Gordon are inadmissible hearsay; they (and plaintiff's counter-statements) are also not material to the issues presented in defendants' motion for summary judgment. The court declines to strike these

24  materials, but will only consider statements in them which meet the requirements of Rule 56.

1    committed together. Dkt. 34-3 at 21. It would not be possible to house both ex-spouses at

2    WCCW and to keep them from communicating. Dkt. 35 at ¶ 8.

3         Washington does not have another women's prison at which plaintiff could be housed.

4    Dkt. 35 at ¶ 3. Where there is a need to keep two female inmates from having any contact, DOC

5    has pursued an out of state placement for one individual and kept the other at WCCW. Dkt. 35 at

6    ¶ 9. Rose Gordon is functioning well at WCCW, is actively programming and has visitors,

7    family and friends in the area. *Id*. Accordingly, DOC has been pursuing an out of state placement

8    for plaintiff, who does not have the same level of connections to the State of Washington. Dkt.

9    34 at ¶ 7. Inquiries have been sent to five states, and have been declined by two. *Id*. DOC is

10   awaiting a response from three additional states—North Carolina, Oklahoma and Oregon. *Id*.

11                            **II. DISCUSSION**

12   **A.    Legal Standards**

13      1.   <u>Summary Judgment</u>

14         Summary judgment is appropriate when the "movant shows that there is no genuine

15   dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

16   Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The central issue is

17   "whether the evidence presents a sufficient disagreement to require submission to a jury or

18   whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at

19   251–52.

20         The moving party bears the initial burden of showing "that there is an absence of

21   evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

22   (1986). Where the moving party does not bear the burden at trial, it can carry its initial burden by

23   presenting evidence that negates an essential element of the nonmoving party's case, or by

24

establishing that the nonmovant lacks the quantum of evidence needed to satisfy its burden at trial. *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the moving party bears the burden at trial, it can meet its initial burden by presenting evidence sufficient to demonstrate that no reasonable trier of fact could find for the nonmoving party; the evidence presented must establish beyond controversy every essential element of the claim. *S. California Gas. Co. v. City of Santa Ana*, 336 F.3d 885, 888–89 (9th Cir. 2003).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986). Genuine disputes are those for which the evidence is such that a "reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 257. Material facts are those which might affect the outcome of the suit under governing law. *Id.* A mere scintilla of evidence is insufficient to create a factual dispute. *Id.* at 252. Likewise, the nonmoving party cannot "defeat summary judgment with allegations in the complaint, or with unsupported conjecture or conclusory statements." *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).

Allegations based merely on the plaintiff's belief are insufficient to oppose summary judgment, as are unsupported conjecture and conclusory statements. *See Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003); *McElyea v. Babbitt*, 833 F.2d 196, 197–98 n.1 (9th Cir. 1987). In ruling on a motion for summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party, *Matsushita Elec. Indus. Co.*, 475 U.S. at 587, and may not weigh the evidence or make credibility determinations, *Anderson*, 477 U.S. at 248.

2. Section 1983 Standard

To sustain a § 1983 civil rights claim, plaintiff must show (1) she suffered a violation of rights protected by the Constitution or created by federal statute, and (2) the violation was

proximately caused by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). The causation requirement of § 1983 is satisfied only if a plaintiff demonstrates that a defendant did an affirmative act, participated in another's affirmative act, or omitted to perform an act which he or she was legally required to do that caused the deprivation complained of. *Arnold v. Int'l Bus. Machines Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981).

"The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation." *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988). Vicarious liability may not be imposed on  supervisory employees for the acts of their subordinates in an action brought under 42 U.S.C. § 1983. *Lemire v. California Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013). A supervisor may be held liable under § 1983 only "if he or she was personally involved in the constitutional deprivation or a sufficient causal connection exists between the supervisor's unlawful conduct and the constitutional violation." *Jackson* v. *City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001).

**B.    Personal Participation**

Defendants argue plaintiff has failed to establish the personal participation of several of the named defendants in the alleged violations of her constitutional rights. Specifically, defendants contend plaintiff's claims fail against defendants Jay Inslee, Cheryl Strange, Julie Martin, Ronald Haynes, Erik Jackson, Dr. Bruce Gage, Dr. Gabrielle Gaspar and Dr. Arieg Awad.

To obtain relief against a defendant under Section 1983, a plaintiff must prove a particular defendant has caused or personally participated in causing the deprivation of a particular protected constitutional right. *Arnold,* 637 F.2d at 1355. To be liable for causing the

deprivation of a constitutional right, each defendant must commit an affirmative act, or omit to perform an act he or she is legally required to do, which causes plaintiff's deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). Plaintiff must establish facts showing the individual defendant participated in or directed the alleged violation or knew of the violation and failed to act to prevent it. *See Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998). Sweeping conclusory allegations against an official are insufficient to state a claim for relief. *Leer*, 844 F.2d at 634. A plaintiff must set forth the specific factual basis supporting his claim for each defendant's liability. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

"A supervisor may be liable under § 1983 only if there exists either '(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001). Supervisors may not, however, be held liable merely for being present at the scene of a constitutional violation or for being a member of the same operational unit as a wrongdoer. *Felarca v. Birgeneau*, 891 F.3d 809, 820 (9th Cir. 2018) (citing *Jones v. Williams*, 297 F.3d 930, 936–37 (9th Cir. 2002)).

Furthermore, senior prison administrators cannot be held vicariously liable for the alleged acts of prison medical personnel. *Hamby v. Hammond*, 821 F.3d 1085, 1093 n.4 (9th Cir. 2016) ("We note that Secretary Warner cannot be held vicariously liable under § 1983 for any violations committed by prison medical personnel"); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989) (State Department of Corrections Director cannot be held vicariously liable for the fault of prison personnel); *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").

1    Plaintiff's claims against defendant Inslee allege no more than a conclusory claim for

2    supervisory liability. *See* Dkt. 5 at 4 (defendant Inslee "is held responsible for state employees

3    under his watch"). Plaintiff has established no personal participation in any of the alleged wrongs

4    by defendant Inslee, and the Court therefore recommends her claims against him be dismissed.

5        Plaintiff's claims against defendants Strange and Martin are premised solely upon their

6    receipt of a letter from plaintiff, to which plaintiff claims neither responded. Dkt. 5 at 5, 6.

7    Instead, plaintiff alleges that it was defendant Haynes who responded. *Id*. at 6. Similarly,

8    plaintiff's claims against defendant Haynes are solely based upon Haynes' response to plaintiff's

9    letter to defendant Strange. Id. at 6. Plaintiff does not establish facts demonstrating defendants

10   Strange, Martin or Haynes played any role in either the housing decisions or GD treatment

11   decisions she challenges here. The Court therefore recommends plaintiff's claims against

12   defendants Strange, Gaspar and Haynes be dismissed.

13       Plaintiff's claim against defendant Gage likewise fails to establish personal participation

14   in any of the alleged violations of her rights. Plaintiff alleges only that Dr. Gage authored the

15   2016 GD-CRC summary approving plaintiff's GD treatment with hormone therapy. Dkt. 5 at 9,

16   16–17. Dr. Gage also attended the May 23, 2017 meeting at which the GD-CRC reaffirmed its

17   previous authorization of plaintiff's hormone therapy. Dkt. 36-4 at 152.[5] Plaintiff provides no

18   evidence that Dr. Gage was involved in any subsequent treatment of her GD, nor in any further

19   meetings of the GD-CRC. There is no evidence Dr. Gage personally participated in decisions

20

21

22   _____

23       [5] To the extent plaintiff seeks to allege any claims arising out of the 2016 and 2017 decisions, they would
     be barred by the three-year statute of limitations applicable to § 1983 claims. *See Rose v. Rinaldi*, 654 F.2d 546, 547

24   (9th Cir. 1981) (applying the three-year limitations period in RCW 4.16.080(2) as the applicable period for § 1983
     claims).

1    regarding plaintiff's housing or in any delays in scheduling her GCS. The Court recommends

2    dismissal of the claims against defendant Gage.[6]

3            Similarly, plaintiff provides no facts establishing any personal participation by defendant

4    Gaspar. Plaintiff alleges only that Dr. Gaspar was a "guest" on a panel addressing plaintiff's

5    treatment, and the record shows she attended the May 18, 2017 meeting at which plaintiff's

6    approval for hormone therapy was reaffirmed. Dkt. 5 at 11. The records of the remaining GD-

7    CRC committee meetings regarding plaintiff's GD treatment do not reflect Dr. Gaspar's

8    participation. *See* Dkt. 5 at 16 (November 28, 2016 meeting). Dkt. 36-3 at 32 (March 12, 2020

9    meeting); Dkt. 5 at 21 (March 8, 2021 meeting). Plaintiff makes conclusory allegations that Dr.

10   Gaspar "ignored" plaintiff's concerns (Dkt. 5 at 12) but provides no evidence Dr. Gaspar

11   provided medical treatment or participated in any of the GD-CRC or housing decisions at issue

12   in this case. The Court recommends plaintiff's claims against defendant Gaspar be dismissed.

13           The Court finds, however, that plaintiff has submitted sufficient evidence to raise issues

14   of fact regarding the personal participation of defendants Jackson and Awad. Defendant Jackson

15   signed the September 2, 2021 facility MDT recommendation that plaintiff not be considered for

16   a transfer to WCCW. Dkt. 34-3 at 21. Similarly, defendant Awad was involved in scheduling

17   plaintiff's GCS procedure. Dkt. 36-5 at 2, 7–8. Thus, there is evidence that, taken in the light

18   most favorable to plaintiff, could demonstrate the personal participation of defendants Jackson

19

20

21

22   _____

     [6] In response to the service of the complaint in this matter, defendants' counsel filed a notice on January 6,
23   2022 stating that defendant Gage is deceased. Dkt.15. Dr. Gage's personal representative has not been identified,
     served, or appeared. In light of the Court's recommendation that the claims against Dr. Gage be dismissed, the Court
24   need not address whether they should also be dismissed for failure to substitute the personal representative pursuant
     to Fed. R. Civ. P. 25(a)(1).

and Awad in, respectively, decisions regarding plaintiff's housing and the scheduling of her GCS.[7]

**C.    Fourteenth Amendment Claims**

Plaintiff alleges defendants' conduct violated her Fourteenth Amendment rights. Dkt. 5 at 3. Plaintiff does not specify whether her claims are brought under the due process or the equal protection clause of the Fourteenth Amendment; construing plaintiff's complaint liberally, the Court will analyze claims under both clauses.

1.    Due Process

Pursuant to the Due Process Clause of the Fourteenth Amendment, "no state shall 'deprive any person of life, liberty, or property without due process of law.'" *Toussaint v. McCarthy*, 801 F.2d 1080, 1089 (9th Cir. 1986), *overruled on other grounds*, *Sandin v. Conner*, 515 U.S. 472 (1995). The due process guarantees of the Fourteenth Amendment thus "apply only when a constitutionally protected liberty or property interest is at stake." *Tellis v. Godinez*, 5 F.3d 1314, 1316 (9th Cir. 1993).

Prisoners have no liberty interest in avoiding being transferred to another prison, or to be housed in a particular institution. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Meachum v. Fano*, 427 U.S. 215, 225–27 (1976). There is no constitutional right to incarceration at a prison of plaintiff's choice. *Williams v Wood*, 223 F.App'x 670, 671 (9th Cir. 2007); s*ee also Rizzo v. Dawson*, 778 F.2d 527, 530 (9th Cir. 1985) (due process protections generally do not apply when prison officials change an inmate's place of confinement, "even though the degree of confinement may be different and prison life may be more disagreeable in one institution than in

---

[7] The Court notes that, as a result of its recommendations below regarding the merits of plaintiff's claims, it ultimately recommends dismissal of all claims as to all defendants.

another"). *See also Aliahmed v. Troxler*, 839 F.App'x 675, 677 (3d Cir. 2021) (because transgender plaintiff lacked a cognizable liberty interest in being confined in a particular institution, she was unlikely to succeed on claim for injunctive relief to transfer to a women's prison).

Furthermore, plaintiff has no due process right to be housed with an inmate of her choice. *Allen v. Figueroa*, 56 F.3d 70 at *7 (9th Cir. 1995) (citing *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982)). *See also Guy v. Espinoza*, No. 119CV00498WIEPGPC, 2020 WL 309525, at *11 (E.D. Cal. Jan. 21, 2020), *report and recommendation adopted,* No. 119CV00498AWIEPGPC, 2020 WL 949556 (E.D. Cal. Feb. 27, 2020) ("an inmate does not have a due process right to be housed with compatible inmates, and housing circumstances that are viewed as less favorable to an inmate do not implicate or infringe on the inmate's liberty interest."); *Williams v. Reynoso*, No. 1:15-CV-00785-MJS, 2015 WL 3795033, at *2 (E.D. Cal. June 17, 2015) ("Plaintiff has no right to a particular housing arrangement, and the refusal to house him with someone with whom he shares interests or proclivities cannot be said to have inflicted unnecessary pain or disproportionate punishment").

Plaintiff's due process claims fail, because she has no liberty interest in being housed in any particular prison or with any particular cellmate.

   2.   Equal Protection

"To state a § 1983 claim for violation of the Equal Protection Clause, a plaintiff must show that [s]he was treated in a manner inconsistent with others similarly situated, and that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Thornton v. City of St. Helens*, 425 F.3d 1158, 1166–67 (9th Cir. 2005) (internal quotations omitted). To allege an equal protection violation based on race or other protected status, plaintiff "must show that the defendant acted with an intent or purpose to

1  discriminate against [her] based upon [her] membership in a protected class. Intentional

2  discrimination means that a defendant acted at least in part *because* of a plaintiff's protected

3  status." *Serrano v. Francis*, 345 F.3d 1071, 1082 (9th Cir. 2003) (citations and quotations

4  omitted).

5      Plaintiff has submitted no evidence showing a discriminatory motive for either the

6  alleged delay in scheduling her GCS procedure or the denial of her requested transfer to WCCW.

7  On the contrary, with respect to plaintiff's medical claims, defendants have submitted evidence

8  they followed their established medical protocols in considering plaintiff for GCS and, after it

9  was approved, have been working to schedule the procedure—but have faced difficulties due to

10  the limited number of available surgeons for the procedure and the cancellation of surgeries due

11  to the COVID 19 pandemic. Dkt. 41 at ¶¶ 5–8. Plaintiff has submitted no evidence

12  demonstrating any discriminatory motive underlying the challenges in scheduling her surgery.

13      Similarly, plaintiff has not submitted evidence demonstrating defendants' refusal to

14  transfer her to the prison in which her former spouse and co-defendant is housed was motived by

15  a discriminatory animus. First, plaintiff does not establish she was treated differently based upon

16  her membership in a protected class. Indeed, plaintiff acknowledges that DOC has permitted the

17  transfer of 10 other transgender prisoners to WCCW. Dkt. 34 at ¶ 4; Dkt. 39 at 5. Plaintiff

18  appears to suggest she is being discriminated against based upon her crime, but sex offenders are

19  not a protected classification for due process purposes.

20      Moreover, defendants have submitted evidence showing their decision not to transfer

21  plaintiff to WCCW was due to security concerns in light of a "keep separate" order between

22  plaintiff and her ex-wife and co-defendant, who is currently confined at WCCW and has

23  expressed safety concerns about being housed with plaintiff. Dkt. 35 at ¶¶3–5, 7–8; Dkt. 35-1.

24

1    Plaintiff provides only unsworn, speculative and conclusory statements asserting the safety

2    concerns are pretextual. Dkt. 39 at 5.

3         Plaintiff has submitted internal DOC emails acknowledging that DOC has not generally

4    prohibited housing co-defendants or spouses at the same facility in the past. Dkt. 39-2 at 76.

5    However, this generalized comment cannot establish that similarly situated inmates are treated

6    differently from plaintiff, because plaintiff's case presents serious safety and security concerns in

7    addition to the co-defendant and ex-spouse relationships. Here, defendants have submitted

8    evidence that DOC has issued a "keep separate" restriction based upon safety fears expressed by

9    the co-defendant, as well as the nature of the sex crimes against the co-defendant's child of

10   which both parties have been convicted. Dkt. 35-1.

11        Plaintiff has not submitted evidence establishing defendants' housing decisions were

12   based upon a discriminatory motive. The Court therefore recommends plaintiff's equal

13   protection claims be dismissed.

14   **D.    Eighth Amendment—Housing Assignment Claim**

15        Plaintiff contends defendants' denial of her request to transfer to a women's prison

16   constitutes a failure to protect in violation of the Eighth Amendment. Dkt. 5 at 3; Dkt. 39 at 20.

17   Plaintiff asserts her housing in a male facility leaves her "under constant threat of rape and

18   mental abuse," and the lack of private shower facilities and private toilets in programming areas

19   has led to her withdrawal and increasing isolation in her cell. Dkt. 5 at 6. Plaintiff also generally

20   alleges she has been subject to verbal harassment and inappropriate touching by unidentified

21   inmates, and has submitted corroborating declarations from four fellow inmates. *Id*.; Dkt. 39-1 at

22   2–12.

23        Defendants argue plaintiff has no constitutional right to a particular prison placement.

24   They contend they have acted reasonably and conduct regular reviews of plaintiff's housing to

ensure she is safe; defendants also observe that 31 transgender women have been, and are

currently, safely housed at plaintiff's facility. Dkt. 34 at ¶¶ 3, 8. Defendants note plaintiff is

currently housed in a single cell and has the ability to shower apart from male inmates. *Id.* at ¶ 8.

Defendants contend they cannot transfer plaintiff to the only available women's facility in

Washington State because of safety and security issues raised by the confinement of plaintiff's

co-defendant and ex-wife at that facility; however, defendants state they are pursuing the

possibility of out of state placement options at other women's facilities. ¶ 7.

The Eighth Amendment imposes a duty upon prison officials to provide humane

conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). This duty includes

ensuring that inmates receive adequate food, clothing, shelter, and medical care, and taking

reasonable measures to guarantee the safety of inmates. *Id.*

In cases alleging a constitutional violation based on a failure to prevent harm, the plaintiff

must first meet an objective component by showing "[s]he is incarcerated under conditions

posing a substantial risk of serious harm." *Id.* at 834; *see Clouthier v. Cnty. of Contra Costa*, 591

F.3d 1232, 1242 (9th Cir. 2010), *overruled on other grounds, Castro v. Cty. of Los Angeles*, 833

F.3d 1060 (9th Cir. 2016). A plaintiff must also meet a subjective component by showing the

prison official acted with deliberate indifference to inmate health or safety. *Farmer*, 511 U.S. at

834; *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("[A] claim that a prisoner's confinement

violate[s] the Eighth Amendment requires an inquiry into the prison officials' state of mind.").

"[A] prison official cannot be found liable under the Eighth Amendment . . . unless the official

knows of and disregards an excessive risk to inmate health or safety; the official must both be

aware of facts from which the inference could be drawn that a substantial risk of serious harm

exists, and he must also draw the inference." *Farmer*, 511 U.S. at 832; *see also Wallis v.*

1  *Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995). A prison official's "failure to alleviate a significant

2  risk he should have perceived but did not," therefore, cannot "be condemned as the infliction of

3  punishment." *Farmer*, 511 U.S. at 838.

4        Plaintiff does not have a freestanding right to placement in a women's prison. The Eighth

5  Amendment does not impose any such blanket requirement, because a prisoner does not have a

6  constitutional right to a particular prison placement. *Olim*, 461 U.S. at 245. Moreover, even in

7  light of the "ever-present, generalized risk of sexual assault that transgender inmates face,"

8  courts have declined to impose hard-line rules requiring particular prison assignments or cell

9  placements. *Richardson v. D.C.*, 322 F. Supp. 3d 175, 184–85 (D.D.C. 2018) ("*Farmer* does not

10  hold that transgender female inmates, notwithstanding their own housing preferences,

11  may *never* be celled with male inmates."). *See also Minor v. Dilks*, No. CV1918261KMWAMD,

12  2022 WL 3369707, at *6 (D.N.J. Aug. 16, 2022) ("Here, the alleged violation in question is

13  Defendants' failure to immediately transfer Plaintiff to a female prison or housing with other

14  transgender inmates . . .. What few cases do exist on the issue of the appropriate prison

15  placement of transgender inmates suggest that no such clearly established right exists.") (citing

16  *Guy*, 2020 WL 309525, at * 5); *Bradley v. Price*, No. 20-CV-48-JDP, 2021 WL 1895062 (W.D.

17  Wis. May 11, 2021) ("I have found no case holding that single-cell confinement is required for

18  any transgender female inmate housed in a male prison.").

19        Nor does application of the *Farmer* test establish a constitutional violation here. First,

20  plaintiff has not established she is subjected to a substantial risk of serious harm. "Speculative

21  and generalized fears of harm at the hands of other prisoners do not rise to a sufficiently

22  substantial risk of serious harm to his future health." *Williams,* 223 F. App'x at 671. As the court

23  in *Bradley* acknowledged, "[s]exual assault is unquestionably a serious harm . . . [a]nd . . .

24

1   transgender inmates, face a general risk of sexual assault." *Bradley*, 2021 WL 1895062 at *3.

2   But a plaintiff "must do more than show that she faced a general risk of sexual assault: she must

3   show that defendants were aware . . . [of] a *specific* threat to her." *Id*.

4          Here, plaintiff asserts a generalized fear of assault which, she claims, keeps her from

5   showering or attending programming in areas without single-stall toilets. Dkt. 5 at 6. Plaintiff

6   also complains of harassment from fellow inmates, in the form of verbal taunts and insults. *Id*;

7   *See also* Dkt. 39-1 at 2–12. In addition, plaintiff makes generalized reports of being grabbed

8   inappropriately by fellow inmates, but provides no detail or particularized facts relating to any of

9   these events. *Id*. And plaintiff has submitted no evidence that she reported or filed a PREA

10  complaint regarding any inappropriate touching incident or harassment. [8] Vague and conclusory

11  reports of assault, lacking in specific information or detail, are insufficient to meet the *Farmer*

12  standard. *Goff v. Arizona*, 526 F. Supp. 3d 551, 568–69 (D. Ariz. 2020).

13         Furthermore, plaintiff's complaints of verbal harassment are not sufficient to establish an

14  Eighth Amendment claim. *See Austin v. Terhune*, 367 F.3d 1167, 1171 (9th Cir. 2004) (finding

15  incident involving guard that exposed himself to inmate and never physically touched the inmate

16  was not sufficiently serious to constitute an Eighth Amendment violation); *Blueford v. Prunty*,

17  108 F.3d 251, 256 (9th Cir. 1997) (affirming summary judgment in favor of prison officials

18  where "the only arguably sexually harassing conduct . . . was verbal"); *Blacher v. Johnson*, 517

19  Fed.App'x. 564 (9th Cir. 2013) (Eighth Amendment's protections did not extend to mere verbal

20  sexual harassment) (citation omitted). Further, isolated incidents of sexual touching—even when

21

22      [8] Plaintiff mentioned she had experienced harassment/bullying and inappropriate touching during her
23  March 23, 2022 housing review. Dkt. 34-3 at 29. The review notes that, although some of these complaints had been
    previously reported, an incident report was prepared and forwarded for possible PREA reporting. *Id*. A follow-up
24  note indicates the PREA compliance manager reported the matter had already been investigated and determined to be
    unfounded. *Id*.

coupled with occasional offensive sexual remarks—do not rise to the level of a constitutional

violation. *See, e.g.*, *Watison v. Carter*, 668 F.3d 1108, 1112–13 (9th Cir. 2012) (where an inmate

asserted an officer entered his cell and approached the inmate while he was on the toilet, then

rubbed his thigh against the inmate's thigh, "began smiling in a sexual [manner], and left the cell

laughing," the allegations were not sufficient to support a violation of the Eighth Amendment).

Plaintiff has also not established the subjective prong of the *Farmer* test—that defendants

acted with deliberate indifference. There is no evidence plaintiff reported any specific incidents

of harassment or inappropriate touching, and her generalized complaints are not sufficient to

establish defendants knew of, and were deliberately indifferent to, a risk of serious harm. *See

Goff*, 526 F.Supp.3d at 568–70.

Moreover, defendants have introduced evidence showing they reasonably responded to

the generalized risk posed by plaintiff's transgender status. DOC's MDC regularly reviews the

safety of plaintiff's housing assignment, and has, for example, made alternative arrangements for

private showering. [9] Dkt. 34 at ¶ 3, 6; Dkt. 34-3 at 2–32. The MDC has also considered

transferring plaintiff to WCCW—which is the only women's facility in Washington offering the

medium security level plaintiff's crime requires. Dkt. 34 at ¶ 6; Dkt. 35 at ¶ 8. However,

plaintiff's co-defendant and ex-wife is serving her sentence at WCCW and has expressed safety

concerns about being housed together with plaintiff; in light of those concerns, together with

additional considerations such as the nature of their crimes of conviction, DOC has issued a

facility "keep separate" prohibiting housing plaintiff and her ex-wife together. Dkt. 35-1. DOC is

---

[9] Plaintiff's regular housing reviews indicate the showers are in separate stalls with a door and partitions. Dkt. 34-3 at 20, 28. In addition, defendants have provided a time when plaintiff may shower separately from the male population. *Id.* Plaintiff, however, indicated she preferred not to use this alternative because it is late at night and she does not want to go to bed with wet hair. *Id.*

continuing to pursue possible out of state placement options for plaintiff at a women's facility, in light of the unavailability of a transfer WCCW. Dkt. 34 at ¶ 7. Plaintiff also continues to have access to mental health providers to address mental health concerns posed by her GD or other mental health conditions. Dkt. 41 at ¶ 8.

Plaintiff has failed to establish defendants acted with deliberate indifference to a threat of serious harm in considering plaintiff's housing placement. The Court therefore recommends plaintiff's Eighth Amendment claim for failure to protect be dismissed.

**E.    Eighth Amendment—Delayed Gender Confirmation Surgery**

Plaintiff contends defendants violated her rights by excessively delaying the scheduling of her GCS procedure. Dkt. 5 at 12–15; Dkt. 39 at 14–16.[10] In addition, although neither party's briefing addresses it, plaintiff's complaint also appears to challenge recommended adjustments to plaintiff's hormone prescriptions in September, 2021. Dkt. 5 at 13. Construing the complaint liberally, the Court construes the hormone issue as an additional claim.

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (*quoting Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The two-prong test for deliberate indifference requires the plaintiff to show (1) "'a serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) "the defendant's response to the need was deliberately indifferent." *Jett*, 439 F.3d at 1096 (*quoting McGuckin v. Smith*, 974 F.2d 1050,

---

[10] Plaintiff's response to defendants' motion contains discussion of delays in implementing her hormone treatment in 2016 and 2017. Dkt. 39 at 13. It is not clear whether plaintiff intends to assert an additional claim for delayed hormone treatment. However, any such claim would be time-barred as it would have accrued more than three years before plaintiff filed her complaint on October 28, 2021; any request to amend the complaint to add such a claim would therefore be futile.

1059 (9th Cir. 1992) *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133

(9th Cir. 1997)).

The defendants must have known of and disregarded an excessive risk to the plaintiff's

health. *Farmer,* 511 U.S. at 837. Deliberate indifference is shown when prison officials

consciously disregard an excessive risk of harm to an inmate's health or safety. *Id*. at 838–40. It

is "obduracy and wantonness, not inadvertence or error in good faith, that characterize the

conduct prohibited by the Cruel and Unusual Punishment Clause[.]" *Wilson v. Seiter*, 501 U.S.

294, 299 (1991).

Deliberate indifference "may appear when prison officials deny, delay or intentionally

interfere with medical treatment, or [ ] may be shown by the way in which prison physicians

provide medical care." *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). However,

delay in providing a prisoner treatment, standing alone, does not constitute an Eighth Amendment

violation unless the delay causes harm. *See McGuckin,* 974 F.2d at 1059; *Amarir v. Hill*, 243 F.

App'x. 353, 354 (9th Cir. 2007).

Finally, a mere difference of opinion about treatment between plaintiff and prison

medical authorities "does not give rise to a § 1983 claim." *Franklin v. St. of Or., State Welfare

Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981). "Deliberate indifference is a high legal standard. A

showing of medical malpractice or negligence is insufficient to establish a constitutional

deprivation under the Eighth Amendment." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir.

2004). A prisoner must instead show the chosen course of treatment "was medically unacceptable

under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the

prisoner's] health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996), *overruled in part on*

1    *other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014); *see also Toguchi*, 391

2    F.3d at 1058.

3    1.    <u>Delay of GCS</u>

4        Defendants do not dispute that plaintiff's gender dysphoria is a serious medical need.

5    Dkt. 40 at 3. Indeed, the Ninth Circuit has held that it is. *See Edmo v. Corizon, Inc.*, 935 F.3d

6    757, 785 (9th Cir. 2019) ("Gender dysphoria is a 'serious . . . medical condition' that causes

7    'clinically significant distress'—distress that impairs or severely limits an individual's ability to

8    function in a meaningful way."). Instead, the issue here is whether plaintiff has adduced evidence

9    establishing that defendants acted (or failed to act) with the requisite deliberate indifference in

10    failing to schedule plaintiff's surgery earlier than its currently-scheduled date in October 2023.

11    Dkt. 36 at ¶ 9.

12        The GD-CRC approved plaintiff for GCS on March 8, 2021. Dkt. 5 at 21. The Committee

13    approved the recommendation of outside consulting psychologist Dr. Manthos for feminizing

14    genital surgery and chest reconstruction. *Id*. It also approved Dr. Manthos's recommendations to

15    ensure educational and informed consent processes were supplemented, and for the development

16    of a treatment plan for mental health support. *Id*. On June 15, 2021, Dr. Awad initiated a

17    consultation request for the surgery. Dkt. 36-5 at 2. Plaintiff attended a surgical consultation with

18    the outside provider, Stiller Aesthetics, on July 11, 2022. *Id*. at 12–17. Stiller Aesthetics

19    requested additional mental health documentation on July 22, 2022, which plaintiff's mental

20    health provider, David Christensen, supplied on July 28, 2021. Dkt. 36-5 at 4, 9. Plaintiff is now

21    scheduled for GCS in October 2023. Dkt. 36 at ¶9.

22        Thus, the record shows plaintiff had her initial surgical consultation just over four months

23    after she was approved for surgery. While her actual surgery date is approximately 15 months

24    later, defendants have submitted unrebutted evidence showing this scheduling difficulty is a

1    result of the limited number of practitioners in the field that accept prisoner patients, and a

2    backlog caused by the suspension of procedures during the COVID-19 pandemic. Dkt. 36 at ¶ 6;

3    Dkt. 41 at ¶ 7.

4        There is no evidence this delay was caused by any defendant's deliberate indifference.

5    Instead, the bulk of the delay (between plaintiff's consultation and her surgery date) appears to

6    be related to the surgeon's availability—a matter wholly outside the control of the defendants.

7    As the Seventh Circuit has recognized, "prisons have limited resources, and that fact makes some

8    delay inevitable." *Mitchell v. Kallas*, 895 F.3d 492, 500 (7th Cir. 2018). While recognizing the

9    serious nature of GD, the court in *Mitchell* also concluded a 13-month period during which

10    prison medical providers evaluated plaintiff's request for hormone therapy was not unreasonable.

11    *Id*. Indeed, the court noted several other courts had found longer delays did not constitute

12    deliberate indifference. *Id*. (citing *Arnold v. Wilson*, No. 1:13CV900 LMB/TRJ, 2014 WL

13    7345755, at *6 (E.D. Va. Dec. 23, 2014) (24–month delay in prescribing hormones); *Rowe v.*

14    *Corr. Med. Servs., Inc.*, No. 1:08CV827, 2010 WL 3779561, at *6–7 (W.D. Mich. Aug. 18,

15    2010), *report and recommendation adopted,* No. 1:08CV827, 2010 WL 3779437 (W.D. Mich.

16    Sept. 22, 2010) (15–month delay)).

17        Plaintiff, however, highlights a notation in Dr. Awad's consultation request—which

18    states a previous consultation request was "closed out 8/20/2020" by defendant Rainier as "no

19    longer needed at this time." *See* Dkt. 36-5 at 2; Dkt. 39-2 at 120. This entry is confusing, because

20    the 8/20/2020 closure *predates* by seven months the approval of plaintiff's GCS procedure on

21    March 8, 2021. *See* Dkt. 5 at 21. Plaintiff appears to argue that if this earlier consultation request

22    had not been closed, her scheduling process could have proceeded with less delay. Dkt. 39 at 15.

23

24

1    But plaintiff does not explain how scheduling could have proceeded if the procedure had not yet

2    been approved.

3          While neither party provides an explanation for the cancellation of the then-unapproved

4    consultation, it appears it could be related to plaintiff's original request for GCS—which was

5    considered, and denied, by the GD-CRC on March 12, 2020. Plaintiff's complaint does not

6    allege any claims arising out of this denial, instead focusing solely upon the post-approval delay.

7    Dkt. 5 at 13. To the extent the complaint is construed to allege such a claim, however, it is not

8    supported by any evidence demonstrating defendants acted with deliberate indifference to

9    plaintiff's serious medical needs.

10          The report of the March 12, 2020 GD-CRC meeting continued to support the

11    Committee's previous finding of GD and support for hormone therapy—but the Committee

12    concluded it was unable to support moving forward with an evaluation for GCS at that time. Dkt.

13    36-3 at 32–33. The report notes the consensus of plaintiff's treatment team that her lack of

14    engagement in mental health treatment for her co-morbid conditions, and in health care treatment

15    of her medical conditions, placed her at high risk for complications with surgery. *Id.*  at 33. The

16    Committee also noted unrealistic expectations for the surgery. *Id*. The Committee concluded all

17    of these factors "call into question whether the patient is currently able to provide adequate

18    informed consent regarding GCS or . . . able to adequately cope" with post-surgical recovery and

19    transition. *Id*. These are important concerns in evaluating a patient for an irreversible procedure

20    like GCS. Dkt. 41 at ¶ 5.

21           Plaintiff submits no evidence countering these medical opinions—and makes no

22    argument the denial of GCS at that time was deliberately indifferent to her serious medical

23    needs. Indeed, the record demonstrates the Committee thoughtfully considered plaintiff's

24

1    medical and mental health needs and suggested a path forward—including potential

2    reconsideration of its decision in the future. Dkt. 36-3 at 33. As the record demonstrates, plaintiff

3    followed that path—and was ultimately approved for GCS on March 8, 2021. Dkt. 41 at ¶ 7; Dkt.

4    36-3 at 247; Dkt. 5 at 21. To the extent plaintiff contests the initial denial, she shows no more

5    than a difference of medical opinion about treatment between plaintiff and prison medical

6    authorities; this "does not give rise to a § 1983 claim." *Franklin*, 662 F.2d at 1344.

7        Plaintiff has not established the delay in scheduling her GCS "was medically unacceptable

8    under the circumstances," and was chosen "in conscious disregard of an excessive risk to [the

9    prisoner's] health." *Jackson*, 90 F.3d at 332. The Court therefore recommends plaintiff's claim for

10   delay in scheduling her GCS be dismissed.

11   2.    Hormone Adjustment

12       Plaintiff's complaint refers to a September 21, 2021 blood test report raising concerns

13   about her hormone levels. Dkt. 5 at 12–13, 19. Plaintiff appears to take issue with the

14   recommendation to decrease her dosage, but offers no evidence demonstrating the

15   recommendation was deliberately indifferent to her medical needs. Indeed, the record shows

16   plaintiff's provider consulted extensively with an expert on transgender hormone therapy to

17   balance plaintiff's hormone therapy with the risks posed by plaintiff's other medical conditions.

18   *See* Dkt. 36-5 at 38–47.

19       Plaintiff shows no more than a difference of medical opinion, and cannot establish an

20   Eighth Amendment claim regarding plaintiff's hormone dosage. *Franklin*, 662 F.2d at 1344. The

21   Court recommends dismissal of this claim.

22

23

24

1    **F.    Qualified Immunity**

2          Defendants contend they are immune from plaintiff's claims for damages under the

3    doctrine of qualified immunity. Because the Court recommends dismissal of plaintiff's claims on

4    other grounds, the Court does not reach this issue.

5                                    **III. CONCLUSION**

6          For the above stated reasons, the Court recommends defendants' motion for summary

7    judgment (Dkt. 33) be granted, plaintiff's claims be dismissed with prejudice, and this case be

8    closed.

9          Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have

10   fourteen (14) days from service of this Report to file written objections. *See also* Fed. R. Civ. P.

11   6. Failure to file objections will result in a waiver of those objections for purposes of *de novo*

12   review by the district judge, *see* 28 U.S.C. § 636(b)(1)(C), and can result in a waiver of those

13   objections for purposes of appeal. *See Thomas v. Arn*, 474 U.S. 140, 142 (1985); *Miranda v.*

14   *Anchondo*, 684 F.3d 844, 848 (9th Cir. 2012) (citations omitted). Accommodating the time limit

15   imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on

16   February 24, 2023 as noted in the caption.

17         Dated this 6th day of February, 2023.

18

19   _____

20   David W. Christel
     United States Magistrate Judge

21

22

23

24